## In the Matter of Dorrance-Street.[1]

The act of the general assembly, " in relation to the laying out, enlarging, straightening, or otherwise altering streets in the city of Providence,"—passed January session, 1854,—and which allows not to exceed half the expense of the improvement, when, in the discretion of the city council, it is made in pursuance of the provisions of the act, to be assessed upon the adjacent proprietors benefited thereby, is constitutionally valid.

It does not transgress the limit of "just compensation," imposed by art. 1, sect. 16, of the constitution, as a restriction upon the public right of eminent domain, nor does it conflict with art. 1, sect. 2, of the constitution, which declares, that " the burdens of the state ought to be fairly distributed among its citizens."

Upon the coming in of the report of the commissioners appointed by the court to estimate the damages suffered, and assess the benefits received by proprietors, from the extension of Dorrance-street north, from Broad-street to Exchange Place, in the city of Providence, objection was made to the reception and confirmation of the report, on the ground that the act of the general assembly under which the commissioners proceeded, so far as it authorized the assessment for benefits, or the deduction of benefits from damages, was unconstitutional and void.

The act was passed at the January session of the general assembly, 1854, and was as follows : —

" An Act in relation to the laying out, enlarging, straightening, or otherwise altering streets in the city of Providence.

" *It is enacted by the general assembly, as follows :*

" Section 1. That whenever, in the opinion of the city council

[1] Mr. Justice Sherman sat in this case with the other members of the court.

of the city of Providence, it shall be desirable and necessary to lay out, enlarge, straighten, or otherwise alter any street or portion of a street, in said city, it shall be lawful for said city council to cause the same to be done in manner hereinafter provided, notwithstanding, it may be necessary for that purpose to remove any building, or buildings, or to take any lands, tenements or hereditaments whatever.

"Sec. 2. That whenever and as often as any lands, tenements, hereditaments, or premises shall be required for the purpose aforesaid, the city council may cause application to be made to the supreme court of this state for the appointment of five commissioners of estimate and assessment, which court shall appoint said commissioners as follows : said city council shall give notice of such application, by advertisement to be published in at least two of the public newspapers printed in said city, which notice shall specify the time and place of such application, and the nature and extent of the intended improvement, and shall be published for and during the space of three weeks previous to said appointment, and they shall in addition to said advertisement cause copies of the same in handbills to be posted up for the same space of time in three conspicuous places adjacent to the property to be affected by the intended improvement. At the time thus specified, or at any adjournment thereof the said court shall appoint five discreet and disinterested persons as commissioners of estimate and assessment. But the court shall not necessarily deem every person who is a resident or tax-payer in said city, to be an interested person in the view of this act. Said commissioners shall, before they enter upon the duties of their appointment, severally take an oath or affirmation, before some person authorized by law to administer oaths, " faithfully to perform the trust and duties required of them by this act," which oath or affirmation shall be certified by the person administering the same. .

"Sec. 3. That it shall be the duty of said commissioners to proceed to the place where such laying out, enlargement, straightening, or other alterations are to be made, and after viewing the premises required for the same to cause a survey and plat thereof to be made: and thereupon, they shall cause

notice to be given to all persons interested in said lands, tenements, hereditaments, and premises so required, and to all persons who are owners of lands, tenements, hereditaments, and premises, which are in the opinion of said commissioners benefited by said laying out, enlargement, straightening, or other alterations, of the time and place of making an estimate of the value of the property so required, and of the benefits conferred, by publishing when and where such estimate and assessment will be made, during the space of three weeks, in at least two of the newspapers printed in said Providence; at which time and place said commissioners shall proceed to make *a just and equitable estimate and assessment of the amount of the loss and damage*, if any, over and above the benefit and advantage, and .of the benefit and advantage, if any, over and above the loss and damage, as the case may be, to the respective owners, lessees, parties, and persons respectively entitled unto or interested in the lands, tenements, hereditaments, and premises so required, by and in consequence of the laying out, enlargement, straightening, or other alteration as aforesaid : and a just and equitable estimate and assessment also of the value of the benefit and advantage of such laying out, enlarging, straightening, or other alteration, as the case may be, to the respective owners, lessees, parties, and persons respectively entitled unto or interested in the lands, tenements, hereditaments, and premises not required for said laying out, enlarging, straightening, or other alterations, but which in the opinion of said commissioners will be benefited thereby. And said commissioners shall report thereon to the supreme court without unnecessary delay : and whenever the loss and damage shall exceed the benefit and advantage, said commissioners shall estimate, assess, and report the excess and surplus only, and whenever the benefit and advantage shall be equal and equivalent to the loss and damage, said commissioners shall report that the owner or parties will suffer no loss or damage, as the benefit and advantage will be equal to the loss and damage. And whenever the benefit and advantage shall exceed the loss and damage as aforesaid, said commissioners shall estimate, assess, and report such excess and surplus only. And in all cases where any persons or parties

In the Matter of Dorrance-street.

are interested in any real estate or premises not required as aforesaid, but which in the opinion of said commissioners are benefited as aforesaid, it shall be the duty of said commissioners to estimate, assess, and report the value of such benefit to such owner or owners, lessee or lessees, parties and persons respectively, in respect to the said lands, tenements, hereditaments, and premises. And said commissioners shall set forth in said report the names of the respective owners, lessees, parties, and persons interested in any of the lands, tenements, hereditaments, and premises aforesaid, and an apt and sufficient designation or description of the respective lots or parcels of lands and tenements, hereditaments, and premises aforesaid, with the loss and damage, benefit and advantage, to each as aforesaid. And the said commissioners shall further apportion and assess such portion of the loss and damage as the city council may direct, on application for the appointment of commissioners, not exceeding one half of the loss and damage ascertained as aforesaid, upon the persons and estates so benefited, in the ratio of the benefits conferred, provided that the amount of such assessment shall not exceed the amount of the benefit and advantage ascertained as aforesaid, but in case of such excess, to the extent of such benefit and advantage. And the commissioners shall include said assessment and apportionment in their report aforesaid. And upon the coming in of said report, signed by said commissioners, or any three of them, said court shall by order, after giving notice to the parties interested, and after hearing any matter which may be alleged against the same, either confirm the same, or refer it, in whole or in part, to said commissioners for revisal and correction, or to new commissioners, as they think fit, who shall return the same so corrected and revised to said court, without unnecessary delay, which shall be confirmed or again referred as aforesaid, as right and justice shall require, until a report shall be made which said court shall confirm : but before the confirmation of said report, either of the parties interested, who shall object thereto, may have a trial by jury before said court, in the manner hereinafter provided, to determine the loss and damage, benefit and advantage, apportionment and assessment, as aforesaid. And in case the amount

20 *

of loss and damage, over and above the benefit and advantage as aforesaid, as assessed by said commissioners shall be increased or decreased by the verdict of the jury, or in case the amount of the assessment of the benefit and advantage, over and above the loss and damage, or of the apportionment and assessment, shall be decreased or increased by the verdict of the jury as aforesaid, said supreme court shall confirm the report of said commissioners, after altering the same so as to conform to the verdict of the jury as aforesaid, and the differences in the damages or apportionment in consequence of the change in said report shall enure to or be paid by said city of Providence, and such report, so confirmed, shall be final and conclusive upon all parties. And said city of Providence, after electing that they will make said improvements, as provided in the ninth section of this act, shall become seized of all the lands, tenements, hereditaments, and premises in said report mentioned, that shall be required for said laying out, enlargement, straightening, or other alterations, in trust, nevertheless, that the same be appropriated and kept open as a public street. And said city of Providence may thereupon, by such person as the board of aldermen of said city shall order, either immediately or at any time or times thereafter, take possession of the same, or any part or parts thereof, without any suit or proceeding at law for that purpose, and remove all buildings and other impediments as said board of aldermen shall direct. Provided, however, that it shall be lawful for said city council, by such person or persons as they shall direct, at any time before the final confirmation of said report as aforesaid, to agree with any of the parties interested, as to the loss and damage, benefit and advantage, apportionment and assessment, to each as aforesaid. And in case any real estate belonging to the city of Providence shall be taken or benefited as aforesaid, said commissioners shall estimate and assess the loss and damage, benefit and advantage, apportionment and assessment, the same as in case of all other real estate.

" Sec. 4. That in all cases where the whole of any lot or parcel of land or other premises, under lease or other contract shall be taken for any of the purposes aforesaid, upon the elec-

tion by the city council as provided in the ninth section of this act, to make said improvements, said lease or contract shall respectively cease and determine and be absolutely discharged. And in case part only of any lot, or parcel of land or other premises, so under lease or other contract shall be taken, all contracts and engagements respecting the same shall from the time of the election aforesaid, cease and determine, and be absolutely discharged as to the part thereof so taken, but shall remain valid as to the residue, and the rents, considerations, and payments reserved or payable and to be paid for, or in respect to the same, shall be so apportioned as that the proportional part thereof justly and equitably payable, or that ought to be paid for such said residue thereof; and no more shall be demanded or paid or recoverable for or in respect of the same.

" SEC. 5. The city of Providence shall within four months after the confirmation of the report of the commissioners, which report shall be confirmed in portions from time to time, pay to the respective persons and parties, in whose favor any sum of money shall be estimated and reported, the amount so estimated, reported, and confirmed. And in default of payment within such time, said person, after application to the city treasurer for payment thereof, may sue for and recover the same with lawful interest, in which suit it shall be sufficient to declare generally for so much money due the plaintiff therein, by virtue of this act, for premises taken for the purposes herein mentioned; and it shall be lawful for the plaintiff to give any special matter in evidence under such general declaration and this act, and the report of the said commissioners, with proof of the right and title of the plaintiff to the sum demanded, shall be conclusive evidence in such suit or action.

" SEC. 6. That the amounts so apportioned, and assessed, and confirmed as aforesaid, to the real estates and premises, and to the owners of said real estates and premises, so required for the laying out, enlargement, straightening, and other alterations of any street as aforesaid, and to such real estate and premises, and the owners thereof, as in the opinion of the commissioners will be benefited thereby, though not required for such laying out, enlargement, straightening, and other alterations, as re-

ported by said commissioners and confirmed by said court, shall be added to the taxes assessed against such real estate and premises, and the owner thereof, by the assessors of taxes for said city of Providence, at the next annual taxation thereof, after the said confirmation of said report, and the same shall be, and remain a lien upon such real estates and premises, from and after such confirmation, until the same is paid, and shall be collected in the same manner as the other taxes assessed against said real estate and the owners thereof, except in cases where the said estates or property are owned by non-residents or minors, in which case, one year in addition shall be allowed.

" Sec. 7. That said commissioners of estimate and assessment shall, at least fourteen days before making their first report to said court as aforesaid, deposit a true copy of such report, and of the plats and maps annexed thereto, in the city clerk's office of said Providence, for the inspection of whomsoever it may concern, and shall at the same time give notice thereof, by publishing the same in at least two of the newspapers printed in the city of Providence.

" Sec. 8. That said commissioners shall each be entitled to receive the sum of three dollars for each day actually employed in the duties of their said appointment, besides all reasonable expenses for maps, surveys, and plats, clerk hire, and other necessary expenses and disbursements, and the same to be paid by said city of Providence. ·

" Sec. 9. And the said city council shall, within thirty days after the making of the first report to said court as aforesaid, elect whether they will make said improvement or not. And shall be authorized at any time, at or before said election, but not afterwards, to discontinue all further proceedings relative thereto, without the necessity of an application to said court for leave so to do. But upon such discontinuance, said city of Providence shall be liable for all costs of court, and all commissioners' fees and expenses which shall have accrued, and said court may enter judgment and issue execution therefor.

" Sec. 10. Either party who shall be dissatisfied with the report of said commissioners, shall be entitled to a hearing before said court, upon his objections thereto, and upon written

application to said court within twenty days after the notice shall have been given by order of court to the parties interested as provided in the third section of this act, for a jury to hear and determine the amount of loss and damage, benefit and advantage, apportionment and assessment, as aforesaid, which said application shall be heard and tried by a jury under the direction of the court; and if the party making such application fail to obtain a diminution of the amount of the benefit and advantage, or apportionment and assessment, or an increase of the loss and damage, as the case may be, such party shall be liable for all costs arising after the entry of such application for a jury, and said court shall enter judgment, and issue execution accordingly; and if the city of Providence apply for a jury and fail to obtain a diminution of the loss and damage, or an increase of the benefit and advantage, or apportionment and assessment, as aforesaid, it shall in like manner be liable for costs, and said court may enter judgment and issue execution for such costs.

"Sec. 11. That whenever all buildings and impediments have been removed by order of the board of aldermen as aforesaid, and the same or a portion thereof be opened for public use, said board of aldermen shall declare the portion of said street so opened a public highway, and the same shall thereafter be a public highway to all intents and purposes.

"Sec. 12. The board of aldermen of said Providence may, notwithstanding this act, whenever requested thereto by said city council and not otherwise, proceed to lay out any highway in said city as heretofore, under the act entitled " an act for laying out highways."

"Sec. 13. This act shall go into effect immediately after the passage thereof, and all acts and parts of acts inconsistent herewith, are hereby repealed."

*Payne, Wm. H. Potter,* and *R. W. Greene,* for the objectors, contended, that the burden of providing sufficient highways in the city of Providence, was, by the operation of this act, unfairly distributed among the citizens of Providence in this, that the act authorized the city authorities to lay out or extend certain streets in the city, to be selected by them, partly at the charge

of those whose estates are adjudged to be benefited by the improvement, whilst other streets were left to be laid out or improved solely by a general tax, which was equally a charge upon all. The act, it was urged, thus conflicted with Art. 1, § 2, of the constitution, which declares : " All free governments are instituted for the protection, safety, and happiness of the people. All laws, therefore, should be made for the good of the whole ; *and the burdens* of the state ought to be fairly distributed among its citizens." They cited *Wiley* v. *Palmer*, 14 Ala. 627 ; *Trustees* v. *McConnell*, 12 Ill. 138.; *Pike* v. *State*, 5 Ark. 204 ; 2 Kent's Com. 332.

The act imposed a tax upon benefits conferred by the improvement to which every citizen was entitled without special assessment, and was therefore unauthorized and void. *Elwell* v. *Shaw*, 1 Greenl. 339 ; *Hall* v. *Merriam*, 2 ib. 375 ; *Drew* v. *Davis*, 10 Vt. 506 ; *Clavis* v. *Robinson*, 9 N. H. 524 ; *Kennett's petition*, 4 Foster, 139 ; 1 Mass. 181 ; 13 ib. 272 ; 15 ib. 144 ; *Mayor of New York* (In the matter of) 11 Johns. 77 ; *Bleecker* v. *Ballou*, 3 Wend. 263 ; *People* v. *Supervisors of Vanden*, 19 Wend. 102 ; *Sharp* v. *Spear*, 4 Hill, 76.

They further contended, that in so far as the act authorized the payment of a proprietor for his land *taken* for a street in estimated benefits from the improvement to his estate not taken, it was in derogation of Art. 1, § 16, of the constitution, which declares : " Private property shall not be taken for public uses without just compensation." *Van Horne's Lessee* v. *Dorrance*, 2 Dallas, 304, 315.

That for these and other reasons the law in question was unconstitutional and void, they cited *Sutton's Heirs* v. *City of Louisville*, 5 Dana, 28 ; ib. 154 ; 7 ib. 81 ; *Jacob* v. *Louisville*, 9 ib. 114 ; *City of Lexington* v. *McQuillan's Heirs*, ib. 513 ; *People* v. *Mayor of Brooklyn*, 6 Barb. Sup. Ct. R. 209 ; *Municipality No. 2*, praying for the opening of Benton-street, v. *Maunsell White et al.* 9 Louisiana, 446 ; 1 Black. Com. 139.

*Clarke*, city solicitor, and *T. A. Jenckes*, for the city of Providence, contended, that the constitution, as to the imposition of burdens, laid down no impracticable rule of equality, but announced the principle of *fairness* as indicative of the spirit in

which taxes should be imposed. Every plan of taxation is but an approximation to perfect justice; and the plan of the act in question for opening or extending streets in cities, so necessary for the public and so beneficial to the estates of adjoining proprietors, was the nearest to justice and practical equality of burdens which could be adopted. It was sanctioned by the practice of the mother country and of the different states of the Union in its principle, as in the case of sewers, the expense of which was assessed upon the lands drained or protected by them. (Stat. 23 Hen. VIII. § 3.) In Massachusetts, the same principle is applied to the building of drains and sewers, and, in both Massachusetts and Connecticut, to the drainage of swamps. Rev. Stat. of Mass. (1836) pp. 251, 673; Rev. Stat. of Cond. (1854) pp. 785, 786. In Pennsylvania, New Jersey, Maryland, Virginia, South Carolina, and Indiana, and probably in all the states, the assessment of burden in proportion to benefits received, has, in application to this and other similar improvements been adopted as the fairest and best. See 4 Comst. 438. Indeed the same principle is applied in all the states, by laying the expense of building and maintaining highways and bridges upon towns, counties, or upon the state treasury, according to circumstances, with a view that such burdens should be borne, as nearly as may be, by those most benefited by the improvements which cause them; and they cited the statutes of the different states in illustration.

From the origin of this colony, they contended, that this mode and principle of laying burdens of this sort had been practised. All highways were once required by law to be provided by the proprietors of the different purchases in the state. Certain roads, as of great public importance in their day, were laid out at the expense of the state, as the "Ten-rod highway," running west from Wickford, the road in Greenville, Smithfield, and High-street in Providence. The expense of watching in Providence and Newport, the damages incurred by the pulling down of houses to stop fire in those towns, were, in early days, assessed upon the inhabitants of the compact parts of them. The paving of streets in Newport was also, about the middle of the last century, assessed upon the owners of the adjoining

estates, and the sidewalk acts for Providence adopt the same method of attaining justice and equality in the imposition of the burden which is the subject of them.

That damages from, may be compensated by the benefits of, a public improvement, they cited *White* v. *County Commissioners of Norfolk*, 2 Cushing, 364; *Simons et al.* v. *Cincinnati*, 14 Ohio, 147.

That the law was constitutional, notwithstanding both the objections made to it, they cited, *People* v. *Mayor of Brooklyn*, 4 Comst. 419; *Nichols* v. *Bridgeport*, 23 Conn. 191.

AMES, C. J.   The question which we are called upon to decide is, whether, under the provisions of the constitution of this state, the court is not bound to declare an act, passed by the general assembly, at its January session, 1854, entitled "An act in relation to the laying out, enlarging, straightening, and otherwise altering the streets in the city of Providence," unconstitutional and void.

There can be no doubt that an act of the general assembly not warranted by the constitutional powers vested in that body, cannot have the force of law, and that it is the duty of this court, when properly called upon, so to declare.   Yet this is a high and important judicial power, not to be exercised lightly, " nor in any case," to borrow the language of a learned court, " where it cannot be made to appear plainly that the legislature have exceeded their powers.   It is always to be presumed, that any act passed by the legislature is conformable to the constitution, and has the force of law, until the contrary is clearly shown."

The law in question authorizes, in substance, the city of Providence, whenever, in the opinion of its city council, it shall be desirable and necessary to lay out, enlarge, or straighten a street, or any portion of a street in the city, to cause the same to be done in the manner provided by the act, instead of in the ordinary manner; the main difference between the old mode and new mode being, that under the former the expense of obtaining the land and of building the street is wholly paid out of the city treasury, whereas, in the mode provided by the new act, a portion of this expense, not to exceed one half the loss and

In the Matter of Dorrance-street.

damage sustained by individuals from the carrying through the improvement may be assessed upon persons interested in estates, adjudged in the first instance, by a board of commissioners, to be benefited by the improvement, not to exceed the amount of the benefit to such owner.

To guard against partiality or misjudgment on the part of the commissioners, they are to be appointed by the court after notice to all parties interested, to be sworn to the due performance of their duties, and in the event that any person is dissatisfied with the assessment against him, he has an appeal to this court, sitting with a jury.

Some minor objections are taken to this act; such as, that the appeal to the jury is only as to the amount of benefits or damages, and not as to the propriety of opening the street; that after the assessments are made the city have a right to say whether they shall, upon full view of the cost, go on with the improvement or not; and that when an assessment for damage and benefit both are made upon a piece of land, part of which is taken, only the surplus or excess of benefit or damage, as the case may be, is to be reported.

Except so far as these may go to show the *animus* with which the law was passed, and may be construed to give the public unfair advantages over the individual citizen, we do not see the bearing of these provisions upon the main question in the case; nor do we see how, even in this view, they aid the objectors to the law.

The city council of Providence is surely far better fitted than a jury, drawn by lot without the city of Providence, to judge concerning the expediency of such great and expensive public improvements as would call for the application of such a law as this; and it has not been even suggested, that the submission of such questions, on appeal, to a jury,—a very questionable feature of our general statute on this subject,—brings this act within the prohibition of any clause of our constitution. Nor do we see any thing oppressive in the provision, that after a full hearing of parties before the commissioners as to the benefits on one side, and the damage on the other, in case an assessment of both is to be made in any particular case, the *excess* of either

only is to be reported; since in this alone is the party really interested, and if dissatisfied with it, he has his appeal to the highest court in the state, and a jury to which he can present a full view of both his damages and benefits—enhancing the one and depreciating the other, as far as proof will allow him, for the purpose of remedying any injustice which may have been done to him.   Still less do we think that the owners of estates in the city of Providence, whether to be taken for or to be benefited by the improvement, who with their fellow-citizens, through the city treasury, may be obliged to pay, in addition to the costs of building the street one half of the loss or damage caused to individuals, by the opening, extending, or altering of it, have any right to complain that the city council should have an opportunity, finally, and with a full view of the expenses to be incurred thereby both by the city and the citizens,—to determine, whether the improvement will not cost more than it is worth,—or whether, in the then state of the city treasury it is financially proper to go on with so expensive a project.   This is another guard against abuse, oppression, and extravagance of expenditure which this law sets up in the mode of its execution, and another opportunity for reconsideration given to those who are charged with the execution of it, of which the objectors to the execution of the law in any case, of all others, should be the last to complain.

The two main objections to the law, however, are—

*First.* That in that portion of it which allows an assessment for benefits, and an offset where a part only of a piece of land is taken between damages and benefits, it infringes the 16th section of the 1st article of the constitution, which provides, that " private property shall not be taken for public use without just compensation;" and

*Second.* That in this respect it also infringes the 2d section of the same article, which declares that "All free governments are instituted for the protection, safety, and happiness of the people.   All laws, therefore, should be made for the good of the whole, and the burdens of the state ought to be fairly distributed among its citizens."

With regard to the first objection, it is evident that it gains

even a fanciful or formal support for its existence, only when the law is to be applied to the case of one, part only of whose land is taken for the street, leaving a part benefited, or to one whose land is taken in one place, he having land benefited in another, in which cases the law provides for a set-off of benefits against damages,—the balance either way, only, to be reported by the commissioners or a jury.

We say formal or fanciful only, because it must be evident that, after all, the real question is, can there be in such case a constitutional assessment for benefits, upon estates benefited by the improvement ; for if there can be, no reason can be given why a man should be excused from this assessment upon one part of his estate really benefited by the improvement, because another part of it has been taken to make the improvement.　In other words, justice requires that as he is to be compensated for his damages in common with his fellow citizens damaged, he should be assessed also with his fellow-citizens, in common with him benefited.　It is the accident of the extent or position of his possessions only which makes him a receiver of compensation, as well as a payer for benefits ; and the set-off of one against the other, when the public is the party also to pay and exact, and the payment to him or exaction from him of the balance only, is a mere form of settling this mutual account, common to individuals and courts of justice, involving no principles except those of safety, expedition, and convenience to both parties concerned in the transaction.　His land is taken ; he has full compensation for that, credited to him on one side of the account, to be paid in money.　His land also is benefited ; he has his tax to pay in money for that, debited to him on the other side of the same account, raised between him and the public.　Certainly, it approaches very near an absurdity, if he is constitutionally liable, on the one hand, to pay a sum of money to the public for the benefits he has received from the improvement, and the public is constitutionally liable on the other hand to pay him in money for the damages which he has sustained by the improvement, to say that he is constitutionally wronged, because in such a case the public, instead of clumsily collecting the money due from him, and putting it

into the treasury with one of its numerous hands, and then taking it out again and paying him for his damages with another of its numerous hands,—pays him the balance due him, if his benefits exceed his damages, or exacts from him the balance due to them, if his damages exceed his benefits. It is a mere mistaking of words for things to say, in such case, that he is compensated, contrary to one clause of the constitution, by benefits instead of money,—if under the general power of the government, and in accordance with the spirit of another clause of the same constitution, he is liable to pay money for those benefits. The fact is, that the *money he owes* pays him for the damages he is entitled to receive. It is no less *the money* of the public because he owes it, than if it were in the treasury; and he might as well lift his voice, as that of one oppressed, against the most familiar and convenient operations of the counting-house, the bank, the clearing-house, and the courts of justice, in every part of the civilized world, as to contend, that this paying and receiving of a balance only, sanctioned by the act, brought it within the inhibition of the great axiom of constitutional law referred to, and everywhere prevailing. This axiom deals not with the mere shows and forms, but subserves and exacts between the many and the individual, the state and the subject or citizen, substantial justice.

The real question in this branch of our inquiry is, whether in any proper sense, the assessment for benefits provided by this law is " a taking of property for public use without just compensation."

Without doubt, every just principle of constitutional law, provided for the protection of property, has its analogies to every other principle of constitutional law, provided and adjusted properly to the same purpose; as we may trace a family resemblance between all the virtues, finding the purest benevolence and the most melting mercy, in even the sternest justice. This results from that " harmony of law," in the large sense in which it is spoken of by the judicious Hooper,—heard in thunders above,—heard, though it may be but in broken whispers, below; the same, however, if we will trace its spirit and meaning, whether swelling up without a discord in the heavens, or faintly

sounding amidst the jarring and confused sounds of earth. Yet the axioms of constitutional law have their differences, as the virtues have, as well as their resemblances. They have their peculiar applications in the great economy of justice, as the others have their peculiar purposes in the great economy of moral providence. In spirit, both extend very wide, and may be made to embrace all their cognates. In application, however, they have their just limits, or they could not be applied by finite beings with any system, or certainty, or benefit at all.

Thus, every one can see that a law unequally taxing one man's property over another's, impairs, in some sense, the obligation of the contract under which it is held, and takes it, in some sense, for public use, without the ordinary compensation of just and equal government; and we frequently say, and with great general truth, that every oppression and injustice of the state violates the spirit of the constitution which was intended to confine it within the limits of equal justice. Yet when the courts come to apply the different provisions of a constitution to a particular law which is said to be in collision with them, and find one provision intended to guard the people against oppressive taxation, another against the passing of laws which impair the obligation of contracts, and still another to limit the power of eminent domain by the necessity of just compensation, as these clauses are all different, and set up for different purposes, so they all have their appropriate limits and applications. From time to time, these have been defined by decisions; and phrases, general in their terms and all embracive in their spirit, have, in this way, at last come to have what is so desirable in practical justice, in order that courts may not be the tyrants of the law, a definite and well-ascertained meaning.

The "*taking*," in the clause in question, is defined to be the actual seizing or direct taking of specific property for public use, as distinguished from incidental injury to it when not taken, on the one hand, or the levying of taxes in the form of money or labor, or even of specific goods, on the other, for the public service. It is not *the thing required*, whether money or service, or a specific article of land or personalty, which constitutes the difference; but *the manner of taking* it. We agree with the

21 *

learned counsellor who closed these causes, in arguing against this law, that it is absurd to say, that under this provision of the constitution the state could not seize the *land* or *goods* of a citizen without compensating him, but yet could seize his *money* in the shape of "a forced benevolence," as it was once called, without any obligation to compensate him for the seizure; and we think, that when the learned judge of the court of appeals of New York came to the conclusion, that money was not within the protection of this constitutional *ægis* because the constitution of New York provided for a mode of ascertaining the value of the things taken, in order to compensation, and this need not be as to money, because the measure of all value, he sacrificed a great principle to a petty formula, he stuck to the letter which killeth, instead of rising upon the spirit which maketh alive. Constitutional law does not pursue so small a track. The distinctions which guide the application of its principles and axioms are found, in general, not in physics, but in metaphysics.

The form and manner, spirit and bearing of an act of state, decide whether it be an exercise of the right of eminent domain, or the right of taxation, and not the mere physical nature of the thing ultimately obtained by it for the public use. The one bears upon the individual, the other upon the whole community, or upon classes of the citizens, or kinds and descriptions of property specifically described, in whosoever hands they may be. The forms of taxation are as various as the ingenuity of man, ever pursuing the Sysiphean task of endeavoring to tax and to please,—difficult, according to Burke, as "to love and be wise," can devise ; and yet no one could ever mistake any of these forms,—capitation, income, direct, excise, customs, house, hearth, or window,—for the rough, direct action of eminent domain, which takes what it wants because it wants it, although it must pay for it.

The purpose of the two powers is different; the one extraordinary, to supply the pressing emergencies, the other ordinary, to meet the daily wants of the state.

No doubt that may be called a tax, which is but a seizure of individual property, with no intent to compensate for the same ;

and so confiscation for pretended crime, being conviction procured by perjury for the sake of the estate, the real guilt being the wealth of the subject and the wants of the tyrant, may be but another form of seizure; but while on the one hand the name cannot alter the thing in the one case, every lawyer knows difference between a confiscation of goods or a forfeiture of the lands upon an unjust conviction or attainder, and taxation in any proper sense, or the exercise of the power of eminent domain. Without pursuing further this subject of differences between the meaning and application of these cognate powers of government—better after all understood practically than described—what feature of this statute assessing persons-benefited by these improvements to the extent of half the damage paid to others on account of them, and not exceeding the amount of the benefits received, assimilates it to an exercise of the power of eminent domain ?

There is no *seizure* or *taking* of any man's land, or goods, or money for the public use, provided for by this clause of the act. The act proceeds upon the basis that the public good requires the improvement to be made, and that it has a right to tax for it; and neither of these propositions is denied by the objectors to the act. It assumes that the whole community of Providence, nay, that the whole public who use the streets of Providence, and for whose wants in this respect Providence is by law bound to provide, are benefited to some extent by it; and hence requires that half at least of the loss or damage to others paid for it, more than half the expense of it of course, should be paid out of the city treasury, from the fund collected by general taxes laid upon all the citizens. It further provides, that a portion of the loss or damage to be paid to others, not to exceed one half, shall be assessed upon those benefited in a special sense by the improvement, the share of each not to exceed, however, the amount of the benefit received by him. In this feature of the act, it assumes that the value of the property of some persons is directly raised by the opening, extension, or alteration of the street. Is this a false assumption ? It is said that these benefits are to be *estimated,* and so may be, in special instances owing to the want of judgment on the part of the commissioners

---

---

or a jury, merely ideal. All this is very true, and it is only saying what we all feel, that every human tribunal, whether it estimates damages or benefits, is imperfect,—that it deals with imperfect instruments, and hence, is liable to be mistaken, mis-led, and even corrupted. Yet no one contends that on this account there can be no just compensation for damages in ful-filment of the condition of taking property for public use; and why not contend for this, as well as complain on this account of the assessment for benefits. No one doubts that there are ben-efits to be assessed for, real and substantial,—back land becom-ing front land, and rising at once from one dollar or two dollars, to the value of four or five dollars, per square foot;—quiet places for residences turned at once into great thoroughfares for busi-ness, as fast as houses can be converted into shops, or brick piled upon brick, for stores. It is common knowledge that this is so with regard to the very improvement in question; nay, proved in the presence of this court at this very term, by evidence in-controvertible.

This is not then a taking of private property for public use in the form of an assessment for imaginary benefits, intended as a cheat and-fraud upon this clause of the constitution, but a fairly intended assessment for actual benefits created to certain prop-erties by the improvement, which do at once and directly pay in general far more than the amount of the assessment, and can-not by the law be less than the assessment.

As no property is *taken*, in the sense of this clause of the constitution, on the one hand, for the public use, so on the other, compensation is not, in justice to be made, as if the case fell within the clause; since the assumption and the fact is, that there are special benefits directly conferred by the improvements upon certain estates, which, in general, *more* than compensate the owners for what is assessed upon them, and can never less than compensate them.

Without at present taking up more time with this point, we conclude that the law does not fall, in any one of its features, or in its purpose, or results, within the inhibition of this clause of the constitution.

Is it void, *secondly*, because within the scope of that general

declaration of the duty of every just government set forth in the 2d section of the 1st article of the constitution, that "All free governments are instituted for the protection, safety, and happiness of the people, all laws therefore should be made for the good of the whole; and the burdens of the state ought to be fairly distributed amongst the citizens?"

We will not stop to notice the very general language and declaratory form of this clause; setting forth principles of legislation rather than rules of constitutional law—addressed rather to the general assembly by way of advice and direction, than to the courts, by way of enforcing restraint upon the law-making power. We do not mean to say that a law, purporting to impose a tax or burden of some sort upon the citizen, may not be in its distribution of the burden, both in design and effect, so outrageously subversive of all the rules of fairness, as not to come so far within the purview of this general clause, as to enable the court to save the citizen from oppression by declaring it to be void. But evidently a wide discretion with regard to the distribution of the burdens of state amongst the citizens was intended to be reposed in the general assembly by the will of the people, as signified in this clause of the constitution. The form is "ought to be," the word is "*fairly*" distributed, not "equally" even—unless equality be fair, which it is not always in any sense, and never is in some senses; and especially, the words are not "equally upon property," or words to that effect, as in the constitution of Louisiana. The words are not as in the constitution of Massachusetts, *empowering* the general court "to impose and levy proportional and reasonable assessments, rates, and taxes upon *all* the inhabitants of, and persons resident, and estates, lying within the said commonwealth,"—broad as has been the construction put upon these words by the supreme court of that state.

Indeed, the language in question can hardly be said to impose any restriction upon the assembly at all, except what would be imposed by the fact of our free institutions, and the general principles of constitutional law, here and everywhere in this country prevalent. Had the constitution been wholly silent upon this subject, a greater latitude could not have been given by these

principles, than seems to be studiedly implied in the form, spirit, and general terms of this sentence.

Much has been said of what is fair in taxation; that equality, in a proper sense is, in general, the true rule of fairness; that due proportion is in some sense implied in it; and that a limit in amount is required by right reason. All this is very true; but yet is so general, that it does not help us forward an atom in deciding upon the constitutional *status* of this law.

The simple, almost practical question, under this clause, is, has this law been so clearly shown to be subversive of the great principles, " that free governments are instituted for the protection, safety, and happiness of the people; that all laws should be made for the good of the whole; and that the burdens of the state ought to be fairly distributed," that this court can with any propriety declare it to be void?

The grand test proposed in such cases is, was it designed to infringe the clause in question, and does its effect concur with that design?

No one *claims* the first, and surely, except by very vague surmises, and the putting of very extreme cases, proper no doubt to be attended to when they arise, no one has brought the least proof, reasoning from what is probable in so eminently practical a matter, of the last concurring requisite of this test.

All taxation is more or less unfair, and in any proper sense, even unequal. Perfect fairness would be, to make all those who are benefited by the burdens of the state to bear them, and to extend the burden in due proportion to every person according to this benefit. Take, for instance, the streets of Providence used by all the inhabitants of the state, nay, of the country, who have occasion to resort hither for business, or pleasure, or instruction. The right of every one of these is as ample to use them, and is as ample, in any way, in them, as that of the rich citizen whose property pays a thousand dollars a year towards the enormous expense of their maintenance; and yet the law casts the entire expense of their maintenance upon those who happen to reside within the limits of certain jurisdictional lines, altered, from time to time, as convenience may require. A far better argument could be got up as to the unfairness of the gen-

eral law in application to the city of Providence, than as to the unfairness of the law in question.

The truth is, that the law in question is an attempt to approximate more nearly to the principle of fairness than the old one, which throws the whole expense of all improvements of this sort, no matter how locally beneficial in raising the value of property within certain limits, upon the treasury of the city. In dealing with a purely practical matter, we are bound to take into view well-known consequences of such improvements in certain cases ; and these are, that sometimes the direct and immediate result of opening a new street in the central parts of a city, is to enhance the value of some lands one half, and of others within a certain circle or in a certain relative position to the new street, in some lesser proportion, whilst upon other estates the improvement will either have no effect, or even the effect to depreciate their value. Is it any thing more than fair, where this is likely to be the case, that those benefited should pay, not exceeding the benefit received, one half of the necessary loss and damage which their neighbors, whose lands are taken or directly injured by the improvement, have suffered ?    *Qui sentit commodum sentire debet onus*, is as old as the common law, because it embodies a maxim of common justice.   Let others pay half the damage for the general advantage to the public, whilst you pay the other half for your special advantage from the improvement, and then there will be equality between you as to this particular burden, which all admit that the public good requires should in some shape be imposed.   Reverse the case, and suppose from the imperfect maintenance of the streets that the public suffer a general evil, but you, in your person and estate, sustain a special one.   The law gives to the public an indictment to redress the general wrong; but to you, a special action for damages, to recompense the particular extraordinary injury which you have sustained.

But it is said, that the public, after half of the damage has been paid by the individuals claimed to be specially benefited, may close it up to-morrow, and so deprive them of those benefits.   Grant the power, although by the terms of the act the city is to become seized of the lands covered by the street, in

trust, that the same be appropriated and .kept open as a public street; is there any reasonable probability that, having paid more than half of this expense, the citizens of Providence will do so unjust and foolish a thing ? We are dealing with a. practical subject; and nothing is so out of place, in such a case, as to invoke fanciful and improbable conjectures, as proofs of unfairness, by way of argument.

Again, it is said that the law is partial, because the city council are not obliged to resort to this method of paying for public improvements of this sort in *all cases*, but may use the old method when they will; and hence, that the persons assessed for benefits in this case to make this improvement, may have to pay for another, quite as valuable to their neighbors, through the general taxes. To suppose that this will be the case, is to suppose that the city council will use their discretion in this respect unwisely, unfairly, or corruptly; the very reverse of the presumption which we are bound to make. If there were nothing in matters of fact to require the use of this power in order to distribute the burden fairly in one case, which is not to be found in all other cases, then indeed it might be said that this discretionary power whenever used, must necessarily be used to distribute the burdens unfairly amongst the citizens, and could have been designed for, and would have no other result than unfairness of distribution. But the fact again, looking at the matter practically, is just the other way. In a crowded city, the opening of a street in the centre of it creates a new business centre or thoroughfare, raising the value of property there and in that vicinity at once, whilst many a street may be opened, straightened, extended, or altered, to the general convenience of the public, without an item of special benefit to any individual proprietor. This power, then, should be resorted to only in those cases in which the former result will come from the improvement. In the latter class of cases, where it is wholly inapplicable, or where, as suggested by the counsel for the city, the benefits to individuals would be so slight that the assessment for them would cost more than they would come to, the old, and more simple mode of proceeding would be the most expedient.

It is even said that, by paying, through the general taxes, for half the damages, the owners benefited have acquired a right to the whole benefit of the improvement; and therefore, to make them pay for the benefits, is to make them pay twice over for them. It is plain that this is taking for granted, looking to the matter of fairness of distribution, that in paying as much as those not specially benefited, for the general advantages of the improvement, they will be left on perfectly equal terms with them; whereas, in fact, for the same amount paid, in certain cases they would reap special advantages to ten, or even an hundred fold.

Again, it is suggested, that if a new street be opened, making a new centre of business so as to affect the one just paid for, there will be no compensation for that; and hence nothing, the argument is, ought to be paid for the benefits received from *the opening* of this. Besides the fact that such a result is very improbable to happen within any reasonable period of time, and if probable, would be a reason why the old, instead of the new system of making the improvement should be resorted to, and if not, would be naturally taken into account in the estimate of benefits, it by no means follows, that because all possible contingencies cannot be guarded against, and all damages that men suffer in cities by the diversion of trade, from various causes, from one section to another, cannot be compensated, that therefore, a direct and certain benefit, conferred on real estate by an improvement, would not permit, in fairness, an assessment to be laid upon the estate benefited, in part payment for the expense of it.

The idea that the law imposes a tax on benefits instead of on persons or property, which are said to be the only legitimate subjects of taxation, is obviously a mere play upon words. The tax is assessed upon *the estate* in proportion to the benefits, if any be received, to equalize and render more fair the distribution of the burden caused by the improvement.

Finally, it is argued that this is an entirely novel mode of raising taxes for the making and improving of highways and streets, and that the clause of our constitution in question, in some way crystallizing the old method as the only fair one in

which money can be raised for this purpose, forbids by implication, any change in this respect. The reasoning by which this implication is raised or obtained is not very obvious, nor is the plan of this law in casting some part of the burden of necessary public improvements upon the estates of those specially benefited by them, unknown in our legislation, from the early colonial times of this state.

The oldest highways in the state, and for many years the only ones, were wholly laid out, and required by law to be laid out, by the proprietors of the lands, for the public benefit.

As early as 1698, a colonial law provided that the value of houses pulled down in Newport, to prevent the spread of fires, should be assessed on the owners of houses not burnt, in the compact part of the city. Dig. 1767, p. 26. The same law was afterwards applied to Providence. Dig. 1767, p. 118. The paving of the streets in Newport was also assessed, in colonial times, upon the owners of the adjoining estates. Dig. 1767, p. 202. So, the expense of watching, in Providence and Newport, was assessed upon the inhabitants of the compact parts of those towns. The expense of the bars and gates of driftways is, to this day, thrown upon the owners of the lands through which they pass. Dig. 1844, p. 320, § 3.

The building of sidewalks in Providence, as early as 1821, was thrown upon the owners of the adjoining land; Ord. Prov. 58; and the filling up of low grounds in the same town was by law, both as a benefit and a duty, cast upon the proprietors; Ord. of Prov. 74; whilst, by the same act, drains may be made and the expense assessed on the owners of land adjoining, in proportion to the benefit received by each. Ibid. 76.

Without referring, therefore, to the same or to similar legislation in every state in the Union, copiously cited by the counsel for the city, for the purpose of showing that by the general sense of the country, this application of the old maxim of the common law, *qui sentit*, &c., might fairly be made to the imposition of burdens specially beneficial to some, over the rest of the community; the examples furnished from the legislation of our own colony and state are ample, for the purpose of showing, that the principle was old long before the adoption of the

constitution, and that this law is merely a new application of it. ·

For these reasons, with others, which it would uselessly consume time to stop to mention, we can find nothing so unfair in design and result in the distribution of the burden of mending and altering of certain highways or streets in the city of Providence, in the discretion of its city council, as to compel us to the conclusion that under the constitution of this state we are bound in duty to declare this act unconstitutional and void. In proper cases we should not hesitate to exercise this power, but we do not deem this to be such a case.

So far as authority from abroad can reflect light upon, or support us in the conclusion to which we have come, we have it in the cases of *People* v. *Mayor, &c. of Brooklyn*, 4 Comst. 419, overruling the decision in same case, 6 Barb. Sup. Ct. Rep. 209, and supporting an act, which threw the whole expense of grading and paving an avenue to the city of Brooklyn, upon the owners of land adjoining it, as well as the law of New York, applicable to the city of New York, passed as early as 1813, and which has governed the practice in that great city, in this respect, ever since.

The same conclusion, in relation to power, given by charter to the common council of the city of Bridgeport, to ascertain who was benefited by the laying out of streets, and to assess the whole or such part of the expense as they might deem reasonable upon them, was come to by the supreme court of Connecticut in 1854, in the case of *Nichols* v. *City of Bridgeport*, 23 Conn. 191.

It is said that the constitutions of these states have no clause similar to that in ours, in relation to the fair distribution of public burdens, and hence that these authorities do not apply to our case. We deem the clause in our constitution no more restrictive in this respect than any of those announcements of general principles of equal rights which are found in every constitution in the country, those of New York and Connecticut included.

In the constitution of Massachusetts, the clause in relation to the power of the general court to tax, before quoted, is still more

special than ours; yet the supreme court of that state held, in the case of *The Inhabitants of Norwich* v. *The County Commissioners of Hampshire*, 13 Pick. 60, that an act of the legislature of that state providing that the expense of building a particular bridge should be borne by the county within which it was situated, when by the operation of the general laws of the commonwealth, the expense is to be borne wholly by the town within which it was situated, was not unconstitutional. It will be seen, by reference to the opinion of Mr. Chief Justice Shaw, who delivered the opinion of the court in that case, that conceiving that there might be circumstances peculiar to the stream and place in question, which might render a departure from the general law just and expedient, the court felt bound, "in just deference to the authority of a coördinate branch of the government," to presume, that a power within the limits prescribed to them by the constitution was exercised by them discreetly, "and with a just regard to the relative rights and interests of different portions of the community."

Applying the principle, thus laid down, to the case at bar, it cannot be doubted how we would be bound to decide it.

The case cited by the counsel for the objectors—*Municipality No. 2, praying for opening Benton-street,* v. *Maunsell White et al.* 9 Louisiana Rep. 446, decided in 1854—seems to have turned upon the court's construction of the peculiar clauses of the constitution of Louisiana in regard to taxation, requiring: 1st, taxation to be equal and uniform, throughout the state; 2d, taxes levied upon all property to be, in proportion to its value, to be ascertained and directed by law; 3d, that no one species of property should be taxed higher than another upon which taxes should be levied; and 4th, a special clause permitting the legislature to levy an income tax, and a tax on persons pursuing any occupation, trade, or profession. It is obvious, that such special constitutional legislation as this, with regard to the legislative power of taxation, gives a far greater control to the courts of that state over the legislature, than any that we can claim, in this respect, over ours.

The other cases quoted from the U. S. Digest, as decided in Kentucky, but not produced, we have had no opportunity of

examining; nor do we know the special grounds under the constitution of that state, or the general reasonings upon which they are founded.

At all events, the weight of authority, as well as our best conclusions, after much consideration, require us to pronounce the statute in question to be, in all respects, constitutionally valid.